IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TONI DRAMSE, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | No. 3:05-CV-524-M |
| | § | |
| DELTA FAMILY-CARE DISABILITY | § | |
| AND SURVIVORSHIP PLAN, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Defendant's Motion for Summary Judgment, filed February 16,

2006, and Plaintiff's Motion for Summary Judgment, filed February 16, 2006. The Court

**GRANTS** Plaintiff's Motion **IN PART**, and finds that Defendant abused its discretion. The

Court **DENIES** Defendant's Motion.

## I. FACTUAL BACKGROUND

Plaintiff Toni Dramse was employed with Delta Air Lines between May 17, 1984, and

November 16, 2000, although her last day at work as a reservations agent was October 13, 2000.

Defendant Delta Family-Care Disability and Survivorship Plan ("the Plan" or "Defendant") is an

employee welfare benefit plan, which, according to Defendant, is established and maintained

pursuant to the Employee Retirement Income Security Act ("ERISA"). Defendant provides both

short-term and long-term disability benefits, as well as other benefits, to non-pilot Delta

employees. The Administrative Committee of Delta Air Lines, Inc. ("the Committee") is the

Plan Administrator and Named Fiduciary (as those terms are defined in ERISA) for purposes of

1

the Plan's operation and administration. The Committee delegated the initial determination of disability under the plan to Aetna Life Insurance Company ("Aetna").

Plaintiff contacted Aetna on August 9, 2000, stating that she was suffering from an on-the-job injury which occurred in 1997. Dr. Michael Gray, Plaintiff's chiropractor, filed a document with the Texas Workers' Compensation Commission on August 21, 2000, which stated that Plaintiff would be able to return to work on August 22, 2000. Aetna certified Plaintiff for short-term disability benefits through August 20, 2000.

In May 2003,[1] Plaintiff contacted Aetna again, seeking long-term disability benefits. On May 7, 2003, Aetna denied Plaintiff any benefits for the period after August 20, 2000, but allowed her sixty days to appeal this denial. Plaintiff appealed the denial to Aetna, and submitted additional medical records. On August 27, 2003, Aetna reversed its initial decision in part, and granted Plaintiff additional short-term disability benefits for the period between May 10, 2000, and November 7, 2000, but denied Plaintiff's long-term disability benefits thereafter.

Plaintiff appealed the denial of long term disability benefits to Aetna on February 17, 2004, and submitted additional medical records. On May 5, 2004, Aetna upheld its denial of Plaintiff's claim for long-term disability benefits. After this, Aetna reopened the appeal to consider more evidence, but reaffirmed its decision on November 2, 2004. Plaintiff then appealed to the Committee.

The Committee upheld the denial of Plaintiff's long-term disability benefits on May 10, 2005.[2] The Committee sent Plaintiff a detailed letter ("the Denial Letter") summarizing the

---

[1] Plaintiff alleges that, for consideration in the settlement of a different lawsuit between Plaintiff and Delta Air Lines, Inc., she was allowed to file her claim for long term disability benefits in May 2003.

[2] Defendant alleges that the Committee decided to ask an independent psychiatric medical examiner whether in his or her professional opinion, Plaintiff was disabled within the meaning of

2

record evidence and explaining the rationale behind the denial. The Denial Letter referenced

much of the record, including submissions from Dr. Gray; Dr. Larry Sharp, D.O.; Dr. Peter

Holm, M.D.; Dr. Martin Fisher, a psychiatrist; Mary Orndorff, LMSW,[3] a psychotherapist; and

Dr. Fulbright, Ph.D.

Plaintiff filed this lawsuit on March 15, 2005,[4] claiming benefits under 29 U.S.C.

§ 1132(a)(1)(B), pre-judgment interest under § 1132(a)(1)(B)(a)(3), attorneys' fees under §

1132(g)(1), and seeking a declaratory judgment that Plaintiff is not required to attend the IME

and that the Committee's decision on Plaintiff's appeal was not in accordance with the Plan.


## II. STANDARD OF REVIEW

The standard of review in this case is governed by this Court's Order of July 21, 2006,

reflecting the parties' agreement that the material facts set forth in the administrative record

considered by the Committee are undisputed, and that the case is suitable for disposition under

Rule 56 of the Federal Rules of Civil Procedure. The agreed Order alternatively empowers the

Court to treat the case as submitted for final resolution.

---

the Plan as of November 8, 2000, based on the record and the independent medical examiner's
examination ("IME"). Defendant further alleges that Plaintiff refused to attend the IME. Plaintiff
denies that she refused to attend the IME; instead, she "attempted to enter a dialog with Delta to
determine what reasoning would suggest that an IME physician, four years later, would be in a
better position to opine regarding Plaintiff's disability on November 8, 2000 than her two mental
health care practitioners". Pl. Reply Br. at 2.

[3]Licensed Master Social Worker.

[4]Defendant filed a Motion to Dismiss on April 20, 2005, alleging that Plaintiff failed to exhaust
her remedies before filing suit. The Court denied this Motion on June 2, 2005, recognizing that
the Plaintiff exhausted her remedies as of May 10, 2005. *See Dramse v. Delta Family-Care
Disability & Survivorship Plan*, 3:05-CV-524-M (N.D. Tex. June 2, 2005) (citing *Hager v.
Nationsbank*, 167 F.3d 245, 247 (5th Cir. 1999)).

III. ANALYSIS

*A. The Plan Confers Discretionary Authority on the Committee*

The United States Supreme Court has held that the denial of benefits under an ERISA

plan is "reviewed under a *de novo* standard unless the benefit plan gives the administrator or

fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of

the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *see also*

*Collinsworth v. AIG Life Ins. Co.*, 404 F. Supp. 2d 911, 915 (N.D. Tex. 2005) (Lynn, J.).

Discretionary authority cannot be implied; an administrator does not have discretionary authority

to determine eligibility or to interpret the plan unless the plan language expressly confers such

authority on the administrator. *See Cathey v. Dow Chem. Co. Med. Care Program*, 907 F.2d 554,

558-59 (5th Cir. 1990). In determining whether such discretion exists, courts should not look for

specific words or incantations; rather, courts should determine the breadth of the administrator's

power from the plan language. *Wildbur v. Arco Chem. Co.*, 974 F.2d 631, 637 (5th Cir. 1992). At

a minimum, a plan construed as providing such discretion should convey that an administrator is

entitled to construe, interpret, or otherwise exercise discretion in determinations of plan

members' eligibility for benefits or in interpreting the plan. *McClure v. Vice President, Human*

*Resources, Union Carbide Corp.*, Civ.A. H030054, 2005 WL 1214645, at *9 (S.D. Tex. May 20,

2005) (citing *Cathey*, 907 F.2d at 559). "[W]hen an administrator has discretionary authority

with respect to the decision at issue, the standard of review should be one of abuse of

discretion." *Baker v. Metro. Life Ins. Co.*, 364 F.3d 624, 629 (5th Cir. 2004) (quotation omitted)

(citing *Vega v. Nat'l Life Ins. Serv. Co.*, 188 F.3d 287, 295 (5th Cir. 1999) (en banc)).

Section 12.01 gives the Plan such discretionary authority:

4

The operation and administration of the Plan . . . the exclusive power to interpret it, and the responsibility for carrying out its provisions are vested in the Administrative Committee of at least three members, which Committee shall be the Administrator of the Plan . . . . The Administrative Committee shall be the named fiduciary of the Plan for the purposes and operation and administration of the Plan.

Plan § 12.01. Section 12.02 states that the Administrative Committee has

[t]he discretionary authority to interpret and construe the Plan, and decide all questions of eligibility of any Eligible Family Member to participate in the Plan or to receive benefits under it, its interpretation and decisions to be final and conclusive;

Plan § 12.02. Finally, section 12.02 also states:

The Administrative Committee shall have the broadest discretionary authority permitted under law in the exercise of all of its functions including, but not limited to, deciding questions of eligibility, interpretation, and the right to benefits hereunder but shall act in an impartial and non-discriminatory manner with respect thereto.

Because the Plan confers discretionary authority on the Committee to interpret the plan, under *Bruch* and *Baker*, the Court reviews the Committee's decision for an abuse of discretion.[5]

## B. The Committee's Interpretation of the Plan Was Legally Correct

The Fifth Circuit has applied a two-step analysis to determine whether an administrator's interpretation of a plan is an abuse of discretion. *See Wildbur*, 974 F.2d at 637. First, the reviewing court determines the legally correct interpretation of the plan. If the administrator did not give the plan the legally correct interpretation, then the court must determine whether the administrator's decision was an abuse of discretion. *See id.* However, "the reviewing court is not

---

[5]The plan must grant discretionary authority to an administrator for a Court to review an administrator's *legal interpretation* of the plan for an abuse of discretion. Whether or not the plan grants such discretionary authority, a Court always reviews an administrator's *factual determinations* for an abuse of discretion. *See Gooden v. Provident Life & Accident Ins. Co.*, 250 F.3d 329, 332 (5th Cir. 2001); *see also Collinsworth v. Hartford Life & Accident Ins. Co.*, No. 3:03-CV-0457-M, 2004 WL 1217935, at *1 (N.D. Tex. June 2, 2004) (Lynn, J.).

rigidly confined to this two-step analysis in every case." *Duhon v. Texaco, Inc.*, 15 F.3d 1302, 1307 n.3 (5th Cir. 1994) ("[B]ecause the administrator clearly did not abuse his discretion, it is unnecessary for the Court to conduct the two-step analysis").

> Section 4.03 sets forth the eligibility criteria for Long Term Disability Benefits:

> If upon expiration of the Employee's Short Term Disability period, [s]he continues to qualify for Short Term Disability, the Employee may apply for Long Term Disability. The employee shall be eligible for Long Term Disability provided [s]he is disabled at that time as a result of demonstrable injury or disease (including mental or nervous disorders) which will continuously and totally prevent [her] from engaging in any occupation whatsoever for compensation or profit, including part-time work.

Plan § 4.03. Analogous language appears in the summary plan description ("SPD"):

> To be eligible to receive LTD benefits, you must:
> -be totally and continuously disabled as a result of a demonstrable injury or disease and unable to engage in *any* occupation or perform *any* work anywhere for compensation or profit, including part-time employment.

SPD at 51. The Committee construed the plan language as requiring that Plaintiff (1) had been totally and continuously prevented from engaging in any occupation whatsoever for compensation or profit, including part-time work, (2) upon expiration of Plaintiff's short term disability period – November 8, 2000. *See* Def. App. at 199.[6]

---

[6]After reviewing the evidence, the Committee "concluded that Ms. Dramse had not shown that as of November 8, 2000, she was impaired to the extent that could [sic] not engage in any occupation whatsoever and was therefore not eligible for long term disability benefits under the Plan." Def. App. at 199. Because the Committee only relied on two requirements in denying Plaintiff's claim  – that Plaintiff (1) was totally and continuously unable to engage in any occupation whatsoever for compensation or profit, including part-time work, (2) upon expiration of Plaintiff's short term disability period – the Court will examine only those two requirements, and will not consider whether Plaintiff was generally disabled as a result of injury or disease.

The Denial Letter expanded on the Committee's conclusion, stating that "The question for the Committee was whether the record showed that, as of November 8, 2000, Ms. Dramse was disabled as a result of a demonstrable injury or disease (including mental or nervous disorders) which would continuously and totally prevent her from engaging in any occupation whatsoever for compensation or profit, including part-time work, and, if so, during what period thereafter was she continuously and totally disabled within the meaning of the plan." Def. App. at 199.

6

Plaintiff argues that the Committee erred in concluding that Plaintiff must had been totally and continuously prevented from engaging in part-time *work*; instead, Plaintiff contends that she need only show that she had been totally and continuously prevented from engaging in part-time *employment*, citing *Rhorer v. Raytheon Engineers & Constructors, Inc.*, 181 F.3d 634, 640 (5th Cir. 1999) ("[I]f there is a conflict between the summary plan description and the terms of the policy, the summary plan description will govern."). In the Court's view, *Rhorer* does not compel Plaintiff's conclusion. Both the Plan and the SPD require that the applicant suffer from an injury or disease that prevents her from engaging in "any occupation . . . for compensation or profit". Whatever the semantic differences between "work" and "employment",[7] "any occupation . . . for compensation or profit" may certainly be construed to include part-time "work" and part-time "employment". The fact that the SPD expressly refers to part-time employment does not compel a conclusion that "any occupation" does not include part-time work; conversely, the fact that the Plan expressly refers to part-time work does not compel a conclusion that "any occupation" does not include part-time employment. Thus, there is no conflict between the SPD and the Plan; under either document, to be eligible for long term disability, an applicant must suffer from an injury or disease that prevents her from engaging in any occupation for compensation or profit, whether that occupation is performed full-time or part-time.

---

[7]Plaintiff contends that "work" suggests any "activity in which one exerts strength or faculties to do or perform something", while "employment" requires "a capability for a predetermined frequency of attendance, a capacity for a predetermined duration of time for each attendance, income which would have made the entire endeavor worthwhile, and be of such quality and character that an employer would actually employ the claimant." Although the Court need not reach the issue, the Court is skeptical of reading such specific limitations into the terms "work" and "employment", especially when the SPD and Plan are silent as to such limitations.

Plaintiff does not contest the Committee's second requirement – that the Committee should examine Plaintiff's condition as of November 8, 2000 to determine eligibility for long-term disability benefits.[8] As a result, the Court accepts this requirement as consistent with the plain language of the Plan. *See* Plan at § 4.03 ("[T]he Employee may apply for Long Term Disability. The employee shall be eligible for Long Term Disability provided [s]he is disabled *at that time* . . ." (emphasis added)).

### C. The Committee's Factual Findings Were an Abuse of Discretion

In *Wyatt v. Amec Choices Benefits Program Long Term Disability Insurance Plan*, the court summarized the abuse of discretion standard:

> When applying the abuse of discretion standard the court's task is to determine whether the administrator acted arbitrarily or capriciously. In this circuit there is only a semantic, not a substantive, difference between the arbitrary and capricious and the abuse of discretion standards in the ERISA benefits review context. A decision is arbitrary only if made without a rational connection between the known facts and the decision or between the found facts and the evidence. An administrator's decision is not arbitrary and capricious if it is

---

[8]In the section of her brief addressing whether the Committee made an unreasonable evaluation of the medical evidence, Plaintiff seems to assume that she need only show that she was unable to work at **some time** after November 8, 2000. (emphasis added) *See* Pl. Br. at 26 ("Since Delta does not dispute the diagnoses, the only issue is whether the symptoms of one or more of these diagnoses/conditions continuously, or in overlapping succession or reoccurrence were severe enough to prevent Plaintiff from engaging in part-time employment on and after November 8, 2000. If Plaintiff was disabled for any period of time, then it goes without question that Delta's decision is an abuse of discretion.") (emphasis in original). However, Plaintiff does not support this contention with any specific argument, and it is refuted by the plain language of the Plan. *See* Plan at § 4.03 ("[T]he Employee may apply for Long Term Disability. The employee shall be eligible for Long Term Disability provided [s]he is disabled *at that time* . . ." (emphasis added)).

Additionally, Plaintiff seems to advance a quasi-estoppel argument, noting that "Delta would not confirm that [the period on and after November 8, 2000] was its focus". Pl. Resp. Br. at 2. However, Plaintiff does not state why this fact has any relevance to the Court's analysis of the Committee's interpretation of the Plan, and the Court therefore declines to consider it.

supported by substantial evidence.[9] Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Nevertheless, an administrator's decision to deny benefits must be based on evidence, even if disputable, that clearly supports the basis for its denial. Without concrete evidence in the administrative record that supports the denial of the claim, the court must find that the administrator abused its discretion.

H-04-1801, 2005 U.S. Dist. LEXIS 15734, at *24-25 (S.D. Tex. May 19, 2005) (Lake, J.)

(quotations and citations omitted).[10] Based on *Wyatt* and *Lain*, the Court initially notes that the

Denial Letter does not reflect the standard this Court uses to review the Committee's

determination. The Denial Letter states that "the record as it is does not support [Plaintiff's]

entitlement to long term disability benefits as of November 8, 2000". Pl. App. at 41. This Court

does not examine whether Plaintiff has supported her entitlement to benefits; rather, the Court

determines whether the Committee's "decision to deny benefits [was] based on evidence, even if

disputable, that clearly supports the basis for its denial". *Lain*, 279 F.3d at 342 (quotation

omitted).[11] If the Committee's denial is not supported by evidence in the record, the Court will

find for the Plaintiff, regardless of whether she has supported her entitlement to benefits with

---

[9]Plaintiff states that there are several pages missing from the administrative record. Plaintiff argues that "[a]n incomplete administrative record is exactly the same as no record and/or no 'substantial' evidence in the summary judgment context where the Court must make a determination as a matter of law." Because the Court finds for the Plaintiff on the record before it, the Court declines to consider these arguments.

[10]*Wyatt* cited *Lain v. UNUM Life Ins. Co.*, 279 F.3d 337, 342 (5th Cir. 2002); *Sweatman v. Commercial Union Ins. Co.*, 39 F.3d 594, 601 (5th Cir. 1994); *Ellis v. Liberty Life Assurance Co.*, 394 F.3d 262, 273 (5th Cir. 2004); and *Richardson v. Perales*, 402 U.S. 389 (1971).

[11]Defendant cites *Horton v. Reliance Standard Life Insurance Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998) and *Farley v. Benefit Trust Life Insurance Co.*, 979 F.2d 653, 658 (8th Cir. 1992) for the proposition that a plaintiff suing under § 1132(a)(1)(B) bears the burden of proving his entitlement to contractual benefits. However, as Defendant implicitly recognizes, in light of *Lain* and *Vega*, which this Court is bound to follow, the Court need only determine whether the administrator abused his discretion. *See* Def. Resp. Br. at 16 (citing *Vega*, 188 F.3d at 298).

9

record evidence.[12] However, if the Committee's decision is supported by substantial evidence

and is not arbitrary and capricious, it must prevail. *See Ellis v. Libery Life Assurance Co.*, 394

F.3d 262, 273 (5th Cir. 2005).

Defendant argues that "[t]he undisputed facts and the medical record strongly support the

Administrative Committee's conclusion that [Plaintiff's] condition did not prevent her from

engaging in 'any occupation whatsoever' including part-time work . . ." Def. MSJ Br. at 14.[13]

---

[12]In her brief, Plaintiff argues that the Committee had an extra-ERISA contractual obligation to
obtain all necessary information to determine Plaintiff's eligibility for benefits, citing *Spacek v.
Maritam Ass'n, ILA Pension Plan*, 134 F.3d 283, 287 (5th Cir. 1998). Without ruling on the
viability of this argument, the Court recognizes that, generally, a "district court may not impose
a duty to reasonably investigate on the administrator". *Vega*, 188 F.3d at 299. Instead, when the
administrator chooses to deny a claim, it must create a record that provides evidence, even if
disputable, that clearly supports the basis of its denial. *Id.* at 299 & n.9 ("[W]e do wish to be
specific about the record an administrator must create, when the administrator *chooses* to deny a
claim.") (emphasis in original). Because the Court finds that the record does not clearly support
the administrator's factual finding that Plaintiff was not psychologically unable to work as of
November 8, 2000, it need not decide whether the Committee had any extra-ERISA contractual
obligations under *Spacek*.

In the same vein, Plaintiff argues that (1) the administrator's fiduciary duty required it to make
further inquiries into Plaintiff's condition, (2) the Committee failed to consult with a
medical/psychological health care practitioner, and (3) the Committee failed to obtain a
vocational analysis to evaluate Plaintiff's capability to work. Because the Court finds that the
record does not clearly support the Committee's factual finding that Plaintiff was not
psychologically unable to work as of November 8, 2000, it need not determine whether the
Committee was required to gather additional information.

[13]The Denial Letter also states that "under Section 4.05 of the Plan, [the Committee] had the
right to request [Plaintiff] to submit to an IME before determining her disability status and that
[Plaintiff's] failure to cooperate with this request in itself constitutes grounds for denying her
long term disability benefit claim." Pl. App. at 41. However, Defendant expressly waived this
argument in its summary judgment motion, so the Court will not consider it. *See* Def. Br. at 8
n.38 ("Although Claimant's refusal to attend the IME is itself grounds for denying her claim
under § 4.05 of the Plan, the Plan is not asserting that ground as a basis for summary
judgment"); Joint Report for Contents of Scheduling Order, filed August 11, 2005, at 1-2 ("The
Plan agrees not to rely on the separate ground for disqualification specified in the first sentence
of the second paragraph of page 41 of [the Denial Letter].")

To support this assertion, Defendant's brief cites Dr. Gray's August 21, 2000,[14] submission to the Texas Workers' Compensation Commission (Def. App. at 891), Dr. Gray's note dated October 17, 2000 (Def. App. at 893), and Orndorff's letter of November 29, 2000 (Def. App. 602).

From the face of Dr. Gray's submission of August 21, 2000, the Court gleans the following facts: (1) Plaintiff visited Dr. Gray on August 21, 2000, at 4 p.m.; (2) this was a "follow-up" visit; (3) Dr. Gray "allowed the employee to return to work as of August 22, 2000, without restrictions"; and (4) Dr. Gray anticipated no further medical care.

The Court notes the following excerpts from Dr. Gray's note dated October 17, 2000:

> I am aware that Toni Dramsi [sic] has been suspended from work because of her irregular job attendance. I just wanted to inform you of the circumstances surrounding her absences. She has missed work because of multiple job-related injuries. She was probably returned to work too soon in an effort to protect her job. . . . At this point in time she continues to recover from her injuries and the fibromyalgia. She is stabilized and will probably not need to miss any more work. . . .

Def. App. at 893.

The Court notes the following excerpts from Orndorff's letter dated November 29, 2000:

> Toni Dramse had been in Psychotherapy with me off and on since 1996. . . . In spite of [her chronic pain] she had done the best she could to continue working. . . . She has been diagnosed with Fybro Myalgia [sic]. She is diligently doing everything she can to achieve the best prognosis possible. . . . Some of my clients have attained full disability whose symptoms are not as severe as Toni's. It is my hope that Toni is reinstated as a Delta employee or offered disability.

Def. App. at 602.

Plaintiff disagrees with the Committee's ultimate conclusion. Plaintiff's brief cites Dr. Fisher's letter dated April 15, 2003 (Def. App. at 604), Dr. Fisher's letter dated August 3, 2004,

---

[14]According to Dr. Gray's submission, Plaintiff visited Dr. Gray on August 21, 2000, and Dr. Gray submitted the form to the Texas Workers' Compensation Commission on the same day. *See* Def. App. at 891.

as excerpted in the Denial Letter (Pl. App. at 30), Dr. Gray's letter dated March 23, 2003 (Def.

App. 603), Dr. Sharp's letter dated November 26, 2003, as excerpted in the Denial Letter (Pl.

App. at 25-28), Dr. Holm's letter dated May 23, 2002, as excerpted in the Denial Letter (Pl. App.

at 28-30), Dr. Holm's letter dated September 30, 2004, as excerpted in the Denial Letter (Pl.

App. at 32-33), and Dr. Fulbright's letter dated December 14, 2004, as excerpted in the Denial

Letter (Pl. App. at 35-41).

Fisher's letter of April 15, 2003 includes the following:

[Plaintiff] has been a patient of mine since February of '96. . . . Concerning work-related stressors, the patient had been followed by me routinely in the summer and fall of 2000. She remains significantly depressed with severe anhedonia, dysphoria, psychomotor retardation, hopelessness, worthlessness, and guilt. She did sustain a suspension from work in 11/2000 and then was subsequently terminated. She has also had recurrent musculoskeletal injuries from a chronic lower bad back. She remained very severely depressed, including exhibiting bipolar depression, as well. She was not able to concentrate. She could not fulfill her work-related duties. She was essentially psychiatrically disabled during that period of time for most of the year of 2000.

Def. App. at 604.

Fisher's letter of August 3, 2004 includes these conclusions:

[M]ajor depression is a primary cause of [Plaintiff's] disability, as well as her medical problems. . . . Her depression has been documented in our chart at least since 1996 through medical observation of severe anhedonia, dysphoria, psychomotor retardation, hopelessness, worthlessness, and guilt associated with chronic bouts of guilt which goes back far, if not farther back, from May of 2000 to 1996. . . . In my expert opinion, her psychiatric condition precludes her from any kind of work ability. She appears always very organic in terms of having no cognitive function.

Pl. App. at 30.

Gray's letter of March 23, 2003[15] includes these statements:

[Plaintiff] has been under my care for the last 6 years for a variety of conditions (carpal tunnel syndrome, cervical strain, headaches, and fibromyalgia) some of

---

[15] Gray's letter is actually misdated March 23, 3003.

which were job related injuries and illnesses. . . . The most significant injury was on 10/12/99 when the chair she was sitting in at work slipped out from under her causing her to fall to the floor. . . . She had great difficulty recovering from that injury and it set off a series of events that resulted in chronic pain, an aggravation of fibromyalgia, depression, and dependency on pain medication. . . . Several attempts to return her to work failed as her symptoms continued to be aggravated by her doing so. . . . Her efforts to return to work that were cut short by her increased pain only cause more mental and emotional stress. Due to that aspect of her recovery she was in counseling with a psychiatrist as well as a psychologist. . . . In retrospect, I believe she should have been on long term disability as long ago as 1999. I do feel her prognosis was and remains guarded primarily due to the underlying fibromyalgia that magnifies even the most minor injury.

Def. App. at 603.

Sharp's letter, received February 23, 2004, does not substantially assist the Court's analysis. Sharp examined Plaintiff on November 26, 2003. Although it is true that Sharp found that Plaintiff was totally incapacitated, disabled, and unable to seek any type of gainful employment as of November 26, 2003, that finding is not probative of her ability to work on November 8, 2000, and the record does not show that Sharp had any contact with Plaintiff in 2000.

Although Holm's letter dated May 23, 2002, makes passing references to Plaintiff's condition as of 2002, it does not opine as to Plaintiff's condition in 2000. The record does not show that Holm had any contact with Plaintiff in 2000. Holm's letter dated September 30, 2004, notes that successful employment is "impossible" for someone with Plaintiff's symptoms, but does not opine on Plaintiff's symptoms as of 2000, except in a general sense. *See* Pl. App. at 32 ("[Plaintiff's] manic-depression disorder began sometime in her 20's [sic]."). Finally, Fulbright's neuropsychological evaluation was performed on December 14, 2004, and does not speak to Plaintiff's condition as of November 8, 2000.

The Committee's factual finding that Plaintiff was not unable to work as of November 8, 2000, necessarily included a determination that Plaintiff was not physically or psychologically unable to work as of that date. Although some record evidence supports a finding that Plaintiff was not *physically* unable to work as of November 8, 2000, Defendant has not cited to[16] any record evidence that supports a finding that Plaintiff was not *psychologically* unable to work as of November 8, 2000, and there is significant contrary evidence. In his letter dated April 15, 2003, Dr. Fisher stated that Plaintiff was "essentially psychiatrically disabled" in 2000, and his letter dated August 3, 2004, states that "her psychiatric condition precludes her from any kind of work ability". Although Dr. Fisher never addressed the ultimate question of whether Plaintiff's psychiatric condition as of November 8, 2000, precluded her from any kind of work at that time,[17] the conclusion that Plaintiff was psychiatrically disabled as of 2000 is certainly relevant to determining whether Plaintiff was able to work as of November 8, 2000.

The Committee attempted to address the Fisher conclusion in the Denial Letter:

> The Committee then looked to psychiatrist Dr. Fisher's notes which included the period from August 9, 1999 through January 1, 2002. The Committee noted that although these notes indicated that [Plaintiff] was suffering from various degrees of depression, Dr. Fisher did not restrict [Plaintiff] from engaging in any life or

---

[16] The Court did not make an independent search of the record; rather, it only reviewed the sections referred to by the parties in their briefing. *See Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003) ("When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court . . . Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment."); *see also Narasirisinlapa v. SBC Communic'ns, Inc.*, 3:05-CV-1-M, 2006 U.S. Dist. LEXIS 13758, at *10 n.4 (N.D. Tex. Mar. 26, 2006) (Lynn, J.).

[17] Plaintiff argues that "Dr. Fisher's opinion could be not more probative of total disability especially since he uses the term part-time sedentary job and any kind of work ability". However, in light of *Lain*, the Court need not determine whether Dr. Fisher's opinion *supports* a finding of total disability. *See* 279 F.3d at 342. Rather, the Court's review is limited to determining whether the record provides clear evidence to support Defendant's factual determinations. *See id.*

14

work activity whatsoever, including full time work. Only in his letter of April 3, 2003, does Dr. Fisher opine that [Plaintiff] "was essentially psychiatrically disabled during that period of time for most of the year of 2000." Again in 2004, based on his last examination of her on April 15, 2003, Dr. Fisher opined that [Plaintiff] was psychiatrically precluded from any kind of work.

. . . .

Dr. Fisher . . . did not opine one way or the other about [Plaintiff's] work capabilities in his contemporaneous office notes, although the lack of any restrictions appeared indicative that he did not consider her highly impaired . . . . Dr. Fisher's contemporaneous statements did not in any way indicate that [Plaintiff] was totally disabled and included no restrictions on any of her work or life activities.

Pl. App. at 43. The Court does not find this reasoning persuasive. If the Committee had before it evidence that Dr. Fisher's usual practice is to note whether a patient is unable to work in his contemporaneous notes, the absence of such notations would be probative. The lack of such notations, when there is no indication that such notations should be in the record,[18] does not contradict Fisher's express finding that Plaintiff was "essentially psychiatrically disabled" in 2000.[19]

The Court notes that Dr. Fisher's statements, in part, prompted the Committee to order an IME, to evaluate whether or not the examiner could opine retroactively as to Plaintiff's ability to work as of November 8, 2000. According to the Denial Letter, Plaintiff refused to attend the

---

[18]There is no indication in the Denial Letter that Dr. Fisher testified to the Committee, or that the Committee asked Dr. Fisher to clarify his statements.

[19]Defendant's citations to *Gooden v. Provident Life & Accident Co.*, 250 F.3d 329, 333-34 (5th Cir. 2001), and *Brigham v. Sun Life*, 317 F.3d 72, 84 (1st Cir. 2003), are unavailing. In *Gooden*, the Court stated that the administrator could not be faulted for disregarding a physician's letter when "in the face of medical documentation, including [that physician's] own reports, indicat[ed] that [the plaintiff] was not disabled". Here, Defendant has not cited to evidence in the record that justifies ignoring Fisher's letters. In *Brigham*, the panel suggested that an administrator could question a doctor's reports if they contradicted his earlier reports. Here, Defendant has not pointed to any reports from Dr. Fisher in the record which contradict those cited by Plaintiff.

15

IME. Defendant does not argue how Plaintiff's refusal to attend an IME provides clear or

concrete evidence that Plaintiff was not psychologically unable to work as of November 8,

2000.[20] Thus, the Plaintiff's refusal to attend the IME does not change the Court's conclusion.

Defendant notes that Dr. Gray allowed Plaintiff to return to work on August 22, 2000,

and stated on October 17, 2000, that she had "stabilized and would probably not miss any more

work".[21] However, Dr. Gray was Plaintiff's chiropractor. His letter of March 23, 2003, suggests

that, although he treated many of Plaintiff's physical conditions (carpal tunnel syndrome,

cervical strain, headaches, and fibromyalgia), he did not attend to her psychiatric or mental

---

[20]Instead, Defendant cites Plaintiff's refusal to attend the IME as a response to Plaintiff's contention that the Committee did not seek additional evidence. *See* Def. Resp. Br. at 14.

[21]These conclusions were somewhat contradicted by Dr. Gray's letter dated March 23, 2003. *See* Def. App. at 603 ("In retrospect, I believe she should have been on long term disability as long ago as 1999."). The Denial Letter addressed the apparent contradiction:

> With respect to Dr. Gray's 2003 letter, the Committee was not persuaded that this statement meant Dr. Gray believed [Plaintiff] was unable to perform any occupation whatsoever, including part time work. The Committee further found that, even if this was what Dr. Gray intended to articulate, it starkly contradicted Dr. Grey's [sic] office notes that were contemporaneous with the effective date of Aetna's denial of [Plaintiff's] disability benefits. Under either interpretation, the Committee chose to credit Dr. Gray's contemporaneous office notes clearing [Plaintiff] for an unrestricted return to work on August 22, 2000 and found nothing in the record that altered this status on or around November 8, 2000.

Pl. App. at 42. In the Court's view, these conclusions rely on incomplete analysis. First, the Denial Letter posits that Dr. Gray did not understand that eligibility for long term disability hinged on a finding that Plaintiff was unable to perform any occupation whatsoever. However, Defendant points to no evidence in the record that shows that Dr. Gray did not understand the applicable legal standard; this conclusion is not supported by concrete evidence as required by *Vega. See* 188 F.3d at 302. Second, although Defendant recognized the contradiction between the submission dated August 21, 2000, and Gray's letter dated March 23, 2003, Defendant did not discuss the note of October 17, 2000. In that note, Dr. Gray admits that "[Plaintiff] was probably returned to work too soon in an effort to protect her job." Without ruling on it, the Court assumes, *arguendo*, that Defendant's reliance on Dr. Gray's August 21, 2000, submission to the Texas Workers' Compensation Commission, concluding that Plaintiff was not physically unable to work, was not an abuse of discretion.

health. *See* Def. App. at 603 ("Due to that aspect of her recovery she was in counseling with a psychiatrist as well as a psychologist."). Therefore, although the Court assumes that this evidence supports a finding that Plaintiff was not *physically* unable to work on November 8, 2000, it does not clearly support a finding that Plaintiff was not *psychologically* unable to work.[22]

Neither does Orndorff's letter of November 29, 2000, address, on a psychiatric or psychological level, Plaintiff's ability to work. She states that she *hopes* that Plaintiff is reinstated as a Delta employee or offered disability. The letter does not clarify whether Orndorff believes that Plaintiff is currently able to work, and hopes that Delta will reinstate her; or believes that Plaintiff is unable to work, and hopes that her condition will change soon, and that Delta will reinstate her at that time; or something else altogether. The Denial Letter implicitly recognizes this: "the Committee noted it was not clear what level of disability Ms. Orndorf [sic] intended to articulate in her statements. . . . The Committee found Ms. Orndorff's statements unclear and not probative of contemporaneous total disability." Pl. App. at 43. As the statements are unclear, they also are not probative of whether Plaintiff was psychologically unable to work as of November 8, 2000.

To prevail, Defendant must show that its conclusion – that Plaintiff's condition did not prevent her from engaging in any occupation whatsoever – was based on evidence that clearly supports the basis for its denial. Defendant points to some evidence that Plaintiff was not physically unable to work on November 8, 2000. *See Lain*, 279 F.3d at 342. However, there is significant evidence of psychological disability as of November 8, 2000, and there is no

---

[22]Without concrete evidence that Plaintiff was not psychologically unable to work, the Court will find for the Plaintiff. *See Vega*, 188 F.3d at 302 ("Without some concrete evidence in the administrative record that supports the denial of the claim, we must find the administrator abused its discretion.")

evidence in the record that supports a conclusion that Plaintiff was not psychologically unable to work on November 8, 2000. *See* Def. App. at 604 (stating that Plaintiff was "essentially psychiatrically disabled" in 2000); Pl. App. at 30 (stating that extreme psychiatric conditions may prevent a patient from engaging in any kind of work). Because the Committee's conclusion that Plaintiff was not psychologically unable to work was not supported by record evidence, the Court finds that the Committee abused its discretion.[23] *See Vega*, 188 F.3d at 299 n.9 (stating that the administrator must create an adequate record when it chooses to deny a claim); *Lain*, 279 F.3d at 342 (holding that the record must contain evidence, even if disputable, that clearly supports the basis for its denial); *Wyatt*, 2005 U.S. Dist. LEXIS 15734 at *24-25.

### D. The Parties Did Not Address the Remedy

Plaintiff argues that, because Defendant abused its discretion, she is entitled to past due benefits from November 8, 2000, until the date of judgment, and reinstatement, so she will receive future payments in accordance with the Plan. However, neither party has briefed, with citation to appropriate authority, the appropriate remedy, or whether the need for additional factual determinations requires a remand. *Cf. Gaines v. Sargent Fletcher, Inc. Group Life Ins. Plan*, 329 F. Supp. 2d 1198, 1224 (C.D. Cal. 2004) (refusing to remand when no additional factual determinations needed to be made). Thus, the Court **ORDERS** each party, by **August 31, 2006**, to file a brief of no longer than five pages, directed to the proper remedy, in light of the Court's findings.[24]

---

[23]Because the Court finds that Defendant abused its discretion, it does not address Plaintiff's argument that the Denial Letter did not satisfy ERISA regulations.

[24]The Court will address Plaintiff's claims for pre-judgment interest and attorneys' fees after it has addressed the remedy.

18

*E. Neither Party Addressed Plaintiff's Declaratory Judgment Claim*

This Order does not affect Plaintiff's claim for declaratory judgment, as neither party has addressed it. In the Court's view, a fair reading of the Joint Report Regarding Contents of Scheduling Order, filed August 11, 2005, suggests that Plaintiff has abandoned this claim. *See* Report at 2 ("Plaintiff is entitled to the [long term disability] benefits under the Plan, attorneys' fees, and costs."). When she files her brief on the remedy, Plaintiff must inform the Court whether she is pursuing a declaratory judgment.

## IV. CONCLUSION

The Court **GRANTS** Plaintiff's Motion for Summary Judgment **IN PART**, and finds that Defendant abused its discretion. The Court **DENIES** Defendant's Motion for Summary Judgment. The Court **ORDERS** each party, by **September 8, 2006**, to file supplemental briefing.

**SO ORDERED.**

August 16, 2006.

BARBARA M.G. LYNN
UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF TEXAS

19